Filed 12/10/13  Joshua P. v. Superior Court CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JOSHUA P., | |
| Petitioner, | |
| v. | G048867 |
| THE SUPERIOR COURT OF ORANGE COUNTY, | (Super. Ct. No. DP023198) |
| Respondent; | O P I N I O N |
| ORANGE COUNTY SOCIAL SERVICES AGENCY et. al., | |
| Real Parties in Interest. | |

Original proceedings; petition for a writ of mandate to challenge an order of the Superior Court of Orange County, Deborah C. Servino, Judge.  Petition denied.

Frank Ospino, Public Defender, Dave Dziejowski, Assistant Public Defender, Scott Kawamoto and Dennis M. Nolan, Deputy Public Defenders, for Petitioner Joshua P.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Julie J. Agin, Deputy County Counsel, for Real Party in Interest Orange County Social Services Agency.

Linda O'Neil for the child M.P.

Linh D. Redhead for Maurene D.

\*　　　\*　　　\*

Joshua P. seeks extraordinary writ relief from an order setting a selection and implementation hearing for his daughter M.P. (born December 2009) on December 11, 2013.  (Welf. & Inst. Code, § 366.26; all statutory references are to this code; Cal. Rules of Court, rule 8.450.)  Father contends there is insufficient evidence to support the juvenile court's order sustaining a supplemental petition and removing M.P. from her mother's custody (§ 387 [court may change or modify previous order by removing child from the physical custody of a parent where previous disposition has not been effective in the rehabilitation or protection of the child]).  He also challenges the sufficiency of the evidence to support the juvenile court's order finding placement with him would be detrimental (§ 361).  Finding no error, we deny the petition.

I

FACTS AND PROCEDURAL BACKGROUND

In October 2010, the Los Angeles County Department of Children and Family Services (DCFS) took nine-month old M.P. into protective custody and placed her with Erica and Joseph M., the parents of mother's childhood friend.  DCFS filed a juvenile dependency petition (§ 300, subd. (b)) alleging M.P. had suffered or was at substantial risk of suffering serious harm based on the parents' unresolved history of alcohol abuse.  The petition also alleged mother suffered from mental illness, including episodes of severe depression that required hospitalization, most recently in March 2010, and her emotional problems placed M.P. at risk.  Finally, the petition alleged father had a

2

history of committing violent acts against mother, most recently in April 2010, when he struck her on the head.

In March 2011, the Los Angeles juvenile court sustained the petition as amended (§ 300, subd. (b)), removed M.P. from the custody of her parents, and ordered reunification services. The case plan included monitored visits (unmonitored for mother while she was in a substance abuse program), individual counseling for both parents, random drug testing, and parenting education. Father's plan included counseling to address domestic violence and anger management issues.

By September 2011, father had completed individual counseling. The counselor reported father "'had made personal changes to become a better person for himself and his family'" and was "'doing well.'" He submitted clean drug and alcohol tests and visited M.P. weekly on an unmonitored basis with no concerns. Father had moved back to San Luis Obispo County and enrolled in a drug and alcohol aftercare program. Mother completed her residential treatment program and obtained housing. At the end of August 2011, DCFS placed M.P. with mother in Pomona.

As of October 2011, father remained compliant with his programs. A DCFS worker visited father's residence, a 124-acre organic farm owned by the paternal stepfather, and found no concerns. The parents expressed interest in reconciling. Father had accepted a job offer from a mechanical contracting firm in Hawaii. On October 26, the court modified its orders to place M.P. in the "home of parent(s) under supervision of DCFS." The court found continued jurisdiction was necessary (§ 364) and directed DCFS to provide family maintenance services. The minute order stated that returning M.P. "to home of Mother is appropriate and is ordered as the permanent plan." The court scheduled a review hearing for April 25, 2012.

On April 9, 2012, police responded to the family's Honolulu residence. Each parent accused the other of destroying property and drinking alcohol, and each denied the other's accusations. The landlord stated he found beer bottles throughout the

3

apartment and father was incoherent when the landlord approached him. DCFS filed a subsequent petition (§ 342) The court made detention findings "as to father only" and M.P. remained in mother's custody. The court ordered monitored visits for father, and directed DCFS to make unannounced visits.

In the May 25, 2012 jurisdiction and disposition report, DCFS recommended transferring the case to Orange County because mother now resided there with a friend she met through her residential substance abuse program. DCFS also recommended "custody be removed from the father," family maintenance services, presumably for mother, and reunification services, apparently for father. DCFS recommended individual counseling, parenting classes, a domestic violence program, and substance abuse counseling with random drug testing and "NA/AA" meetings for father.

By July 2012, father was participating in the San Luis Obispo County substance abuse treatment program. He provided clean drug and alcohol tests and participated in recovery group and 12-step NA/AA meetings. Father had not visited M.P. because of the long distance, his employment, and mother's refusal to allow paternal relatives to monitor visits. Based on father's progress, DCFS recommended the court grant discretion to liberalize "visits to unmonitored contingent upon the father continuing to drug test."

On October 15, 2012, the Los Angeles County juvenile court sustained the allegations of the subsequent petition (§ 342) as amended. The sustained petition included allegations that the parents had engaged in a "violent altercation" in M.P.'s presence on April 9, 2012, and that father "[o]n or about 4/7/12, . . . was under the influence of alcohol while the child was in the father's care and supervision." The court noted there was a "current risk [to M.P.] from [father's] past alcohol abuse."

Turning to disposition, the Los Angeles juvenile court terminated the October 26, 2011 "order for Home of Parents" and directed that "mother shall retain physical custody" under DCFS supervision. The court ordered family maintenance

4

services for father and required father to test for drugs every other week. The court adopted DCFS's recommendation to allow father four unmonitored all-day visits with his daughter, after which father would be permitted overnight visits one weekend a month as arranged by the parties. But father's unmonitored visitation was on the condition he submit clean drug and alcohol tests. The court also ordered the parties to arrange video phone calls (Skype) during father's nonvisitation week. Finally, the court ordered the case transferred to Orange County (§ 375).

The Orange County juvenile court received the case on November 1, 2012, and accepted the transfer at a hearing on November 15. The "Acceptance of Transfer" report for that hearing stated the Los Angeles court placed M.P. in mother's home under DCFS's supervision and ordered family maintenance services for "minor and the parent." The court declared M.P. a dependent child of the Orange County juvenile court and stated "all prior orders are to remain" and that "father is objecting to all of the prior orders." The court set a case plan review for December 19.

SSA's December 19, 2012 interim review report repeated the allegations of the prior petitions. The social worker stated he had left "repeated requests for the prior social worker [in Los Angeles] to contact" him but there had been no response. The social worker stated the case had been "transferred in as a Family Maintenance Case to the mother and the undersigned has adopted the same recommendation." The social worker also reported mother claimed to have completed all case plan responsibilities required by Los Angeles County. The attached case plan update listed various service objectives for both parents. One of father's objectives was "attend and demonstrate progress in a County Certified Domestic Violence Prevention Plan." The accompanying "visitation schedule" stated the social worker would facilitate visitation as set out in the case plan. The schedule allowed father two monthly visits when in Orange County and noted SSA "was authorized to liberalize visits as to frequency, duration, and need for

5

monitoring, reinstating original visitation order only if deemed necessary to protect the child's health and/or safety."

Father did not attend the December 19 case plan review hearing. A minute order reflects father's counsel submitted on SSA's report and the court approved the case and visitation plan "per report of 12-19-12." The court scheduled a six-month review for April 11, 2013.

In late February 2013, SSA filed a supplemental petition (§ 387). Mother had missed drug tests, failed to return the social worker's phone calls, and her current boyfriend left M.P. with the prior caretakers, the M.'s, in early February. The boyfriend reported mother was "ill and unable to care for the child." Mother left the social worker a voice message, but her "words were slurred and most of the message was unintelligible."

At the detention hearing on February 25, which father attended, the juvenile court detained M.P. and ordered monitored visits for mother. The court denied father's request for placement, and kept in place the court's earlier visitation order.

In late March 2013, SSA's report for the jurisdiction and disposition hearing recommended offering no new reunification services for the parents and scheduling a section 366.26 selection and implementation hearing. Father had contacted the new social worker and provided her with a record of his past services. Father stated he would submit to drug tests in Paso Robles. He arranged an appointment with the social worker, Live Scan fingerprinting, and a visit with M.P. in Orange County for March 18. At the meeting, they discussed the new allegations. Father asserted he was not currently abusing alcohol. He denied physically abusing mother and claimed she had falsely accused him. According to father, DCFS had not asked him to participate in domestic violence classes and had "removed domestic violence from the recommendations and referrals." Father supplied photographs of his home and positive references from his employer, his AA sponsor, and drug treatment counselor. The social worker reviewed San Luis Obispo County's family court records and noted father had

6

unmonitored visits with his six-year-old son James, M.P.'s older half-sibling, on Wednesdays and Saturdays.

The social worker reported as "family strengths" that father was employed, M.P. was comfortable in his presence, father utilized community support, and his extended family and friends offered further support. Father was cooperative and expressed a willingness to accept services. Father arranged to attend a domestic violence program in Paso Robles. His visits with M.P. were appropriate and loving, but M.P.'s caretaker Erica reported negative changes in M.P.'s behavior after her visits with father, including hitting, biting, throwing her doll, and nightmares. The social worker noted section 361.5 apparently precluded additional reunification efforts because the family had "been receiving services for the child for approximately two years and five months," the family appeared not to have benefited, and "substance abuse, domestic violence, and mental health" issues continued to exist.

In April 2013, the social worker reported father had enrolled in the domestic violence program and submitted clean drug and alcohol tests. The social worker provided a positive report of father's visit in late March. The paternal grandmother, Shelly P., declared she would like to be considered as an adoptive resource.

Mother eventually resurfaced. She explained she left M.P. with the M.'s after injuring her foot. She conceded she could not "'be the best mother for'" M.P. and did not want to receive services. She was "'terrified'" M.P. would end up with father, and wanted the M.'s to adopt M.P.

Father complained to the social worker that the M.'s enabled mother's negative behaviors, and their daughter Heather, mother's childhood friend, had been arrested twice in the last two years "for theft to support her addictions." The paternal great-grandmother stated she previously worked for Los Angeles County social services, it was important for a child to have a natural parent as a primary caregiver, and father and

his extended family could provide M.P. with the emotional support needed for healthy development.

Father provided receipts showing he had complied with the drug testing requirement and produced a positive report from his domestic violence program. He acknowledged past mistakes, but had "continued with" sobriety to "create a secured stable healthy lifestyle" and "worked to insure that the choices I make today will not be of the past repeated cycle of instability or harm." Father also supplied a plan for M.P. if she were returned to his care, including child care and family counseling. During April, father continued to test free of drugs and alcohol, to attend 12-step meetings and substance abuse counseling, and his visits with M.P. were appropriate and positive. The program facilitator at the domestic violence program submitted a favorable report.

In early May 2013, the social worker favorably described a visit among M.P., father, M.P.'s half-brother James, and the paternal grandmother at SSA's offices. Father continued to submit negative drug tests. He complained to the social worker he found it "disturbing" that M.P.'s caretakers, who were aware of mother's mental health history, did not inform authorities after mother's boyfriend left M.P. with them in early February, and suggested there was a conflict of interest because they apparently were paying for mother's privately retained lawyer even though mother had not appeared for court hearings.[1] He also insisted he had been falsely blamed for the April 2012 incident in Hawaii.

San Luis Obispo social workers assessed the paternal grandmother Shelly's residence for placement. Shelly currently lived with a family friend, Diane, while her home was undergoing renovation. San Luis Obispo social workers reported no concerns with the home. Father, who had been living with Diane, agreed to move into Shelly's home in the interim and have contact with M.P. only as approved by SSA. The social

---

[1] Retained counsel for mother withdrew a few weeks later.

8

worker's May 9 report assessed Shelly's request for placement under section 361.3. She cited M.P.'s "long standing relationship with" the M.'s, where she "continues to be growing, learning, and thriving . . . ." The social worker found it "concerning" that Shelly felt "domestic violence and anger" was not in father's character, although the social worker stated Shelly had the appropriate "knowledge of how to handle" a "potential anger/domestic violence" incident involving father.

The social worker observed she was "concerned that the child's parents appear to continue to repeat the same cycles and fall into the same patterns," and "neither parent appears to have addressed the issues of domestic violence that occurred" in Hawaii. She recommended no further services because the parents apparently had not benefited "from the services received" since October 2010 and it was in three-year-old M.P.'s "best interests to have stability and consistency in her life."

Father requested more frequent visits of longer duration, noting visits had been going well. Travel for visits at SSA's offices in Orange from father's home in Cambria took nine hours and cost $100 for gas. Father continued to submit negative drug tests, proof of attendance at 12-step meetings, and favorable reports from his domestic violence and drug and alcohol programs. The paternal grandmother asked for, and received, unsupervised visits. Father submitted an updated plan if M.P. was placed in his care.

M.P.'s caretaker Erica stated M.P. did "okay" after her latest visit with father, but Erica was concerned about M.P.'s negative behavioral changes that often occurred after seeing father. Erica also stated M.P. declared "'Daddy told me I want to live with him.'" M.P. had stopped hitting Erica, although M.P. was "emotionally up and down."

SSA conducted a team decision meeting with all the parties on June 11, 2013. Following discussion of "concerns and strengths, the impact of multiple placements, the child's sleep disturbances, signs of trauma and acting out, and the

9

uncertainty regarding the direction of the case, all participants reached agreement that in the short term, [M.P.] would remain" with the M.'s pending the outcome of the disposition hearing. The parties also agreed Shelly would receive expanded visitation.

The social worker reported in late July 2013 that father continued to submit negative tests for drugs and alcohol, to attend 12-step meetings, and received positive reports from his domestic violence program and drug and alcohol program. He e-mailed the social worker a summary of what he had learned while attending the program. During a July 15 visit, father and Shelly complained that M.P. was unusually "quiet" and "did not want to eat food" they brought other than a cupcake. She "didn't know her colors, was not responding to her name, and . . . her eyes were dilated." Shelly asked to meet with M.P.'s therapist. Father expressed concern M.P. had "change[d] for the worse" and demonstrated "alarming mental health issues that were not there prior to her seeing the therapist. She has been having a hard time focusing, responding and seems to be a little on edge." The social worker noted the visitation monitor did not have the same concerns about M.P. The monitor explained M.P. had fallen asleep in the car on the way to the visit. The social worker reported M.P. was not taking any medication, but was regressing in her behavior.

The juvenile court conducted a hearing on the supplemental petition beginning July 22, 2013. Father, his therapist, the paternal grandmother, the social worker, and mother testified. At the conclusion of the hearing on August 13, the court found the allegations of the section 387 supplemental petition to be true. The court also found there was or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home. (§ 361, subd. (c)(1).) The court denied Shelly's request for placement and found it was in M.P.'s best interests to remain with the M.'s. The court scheduled a selection and implementation hearing for December 11, 2013. (§ 366.26; § 361.5, subd (f); Cal.

10

Rules of Court, rule 5.565(f).)  Father timely sought writ relief from the orders.  (Cal. Rules of Court, rule 8.450.)

II

DISCUSSION

A.    *Substantial Evidence Supports the Juvenile Court's Finding the Previous Disposition Had Not Been Effective in Protecting M.P.*

Section 387 provides in relevant part that "(a) An order changing or modifying a previous order by removing a child from the physical custody of a parent, guardian, relative, or friend and directing placement in a foster home, or commitment to a private or county institution, shall be made only after noticed hearing upon a supplemental petition.  [¶] (b) The supplemental petition shall be filed by the social worker in the original matter and shall contain a concise statement of facts sufficient to support the conclusion that the *previous disposition has not been effective in the rehabilitation or protection of the child* or, in the case of a placement with a relative, sufficient to show that the placement is not appropriate in view of the criteria in Section 361.3."  (Italics added.)

"A section 387 supplemental petition is used to change the placement of a dependent child from the physical custody of a parent to a more restrictive level of court-ordered care.  [Citations.]  In the jurisdictional phase of a section 387 proceeding, the court determines whether the factual allegations of the supplemental petition are true and whether the previous disposition has been ineffective in protecting the child.  [Citations.]  If the court finds the allegations are true, it conducts a dispositional hearing to determine whether removing custody is appropriate.  [Citations.]  A section 387 petition need not allege any new jurisdictional facts, or urge different or additional grounds for dependency because a basis for juvenile court jurisdiction already exists.  [Citations.]  The only fact necessary to modify a previous placement is that the previous disposition has not been effective in protecting the child.  [Citations.]  [¶]  We review the court's jurisdictional

11

and dispositional findings for substantial evidence. [Citation.] Evidence is "'[s]ubstantial'" if it is "'"reasonable, credible, and of solid value."'" [Citation.] We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if other evidence supports a contrary finding. [Citations.] The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order. [Citation.]" (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1161-1162.)

The record amply demonstrates the Los Angeles court's October 15, 2012 disposition allowing M.P. to remain in mother's physical custody failed to protect the child from the risk of serious harm. Mother's evident relapse and abandonment of M.P. with her prior caretakers constitutes substantial evidence to sustain the juvenile court's section 387 jurisdictional order. Indeed, father submitted below "on the admissible evidence as it pertains to the jurisdiction on [the] supplemental petition."

B.    *Los Angeles County Removed M.P. from Father's Custody in October 2012*

In his petition, father argued the Los Angeles court did not remove M.P. from his custody in October 2012. The record, however, establishes the Los Angeles court removed M.P. from father's physical custody after it sustained the subsequent petition in October 2012. Because father conceded in his reply brief and at oral argument the Los Angeles court did in fact remove M.P. from his custody, we need not consider the issue further.

C.    *Family Maintenance Services and Unmonitored Visitation*

Father argues no substantial evidence supports the juvenile court's conclusion the October 2012 "disposition of family maintenance [services] to father had been ineffective in the rehabilitation or protection of the child." He claims the previous disposition included an order of family maintenance services to him and the order was never implemented in Orange County. And he complains that contrary to the Los

12

Angeles court order, a monitor was imposed on all of his visits after jurisdiction was transferred to Orange County. He notes SSA imposed the requirement of monitored visitation without obtaining the necessary judicial authorization (*In re S.H.* (2003) 111 Cal.App.4th 310, 320).

The Los Angeles court's on-the-record order at the October 2012 hearing was that "mother shall retain physical custody of the child" under DCFS supervision and "[DCFS] is ordered to provide to the father family maintenance services to include at least one drug test every two weeks, visits to be unmonitored, day visits from 8:00 to 5:00 every other weekend on a day, the weekend day to be agreed upon by the parents and coordinated by the social worker. [¶] If, after four unmonitored day visits – that would be over the course of two months – there have been no positive drug tests, father shall be entitled to or shall have unmonitored overnight weekends every [] month beginning on Saturday and dropping off on Sunday. The parties to work with the social worker to determine the exact logistics recognizing that [the parents] live 250 miles apart. . . . [¶] . . . Father has to confirm . . . each visit 24 hours in advance. On the off weekends, the parties shall attempt to arrange a Skype or a FaceTime video phone call between father and" M.P. The minute order provides, "DCFS is ordered to provide to minor and parents or guardians: Family Maintenance Services. . . . FATHER IS TO CONTINUE TO TEST EVERY OTHER WEEK." The minute order tracks the court's on the record visitation order.

Father now agrees the court removed custody from him in October 2012. He also does not explain clearly how the court's order of family maintenance services relates to the issues at the hearing on the section 387 petition. Father apparently contends the court should have returned custody to him because the Los Angeles court's orders were never implemented and therefore the court could not conclude they were ineffective in protecting M.P. But as noted above, mother's relapse and abandonment of M.P. constituted substantial evidence supporting the court's determination the previous

13

disposition had been ineffective in protecting M.P. We agree with M.P.'s counsel that once the court found the section 387 jurisdictional fact true – that the prior disposition had been ineffective – "the court was required to conduct a" dispositional hearing "looking to all the current circumstances regarding both" mother and father. M.P.'s counsel notes the court "could have . . . continued custody with Mother while making new orders for M.P.'s protection; or ordered custody to Father with new orders for M.P.'s protection; or ordered custody to both parents jointly; or, as here, found that custody to either parent would place M.P. at risk."

The only "services" ordered for father by the Los Angeles court in October 2012 were further drug tests every other week. The court also directed unmonitored visitation (four day visits followed by overnight weekends) in Orange County provided father submitted negative tests and notified mother 24 hours in advance of his visit, and subject to mother's right to seek modification in Orange County. But the problem with father's attack on SSA's alleged failure to implement the Los Angeles order is the record contains no information that he fulfilled the drug testing and notice preconditions for those visits concerning drug testing and notice. He admits the record contains no evidence he tested between October 2012 (and maybe even July 2012) and March 27, 2013, although he apparently continued with his criminal court-ordered counseling in San Luis Obispo. He did not attend the acceptance of transfer hearing November 15, 2012, and his appointed lawyer did not object that father had not received the ordered visitation. The court did note father "object[ed] to all of the prior orders," but no details were provided and surely father did not object to the order directing he was to have unmonitored visits.

In early December, father's counsel filed a request to copy the Los Angeles County records. At the case plan review hearing December 19, 2012, no reporter was present. The minute order reflects father did not attend and was represented by counsel. There is no indication counsel objected that SSA had failed to implement the Los

14

Angeles visitation order. Counsel also did not object to SSA's interim report, case, and visitation plans adopted by the court. The report mentioned the Orange County social worker had "been unable to successfully communicate with the former worker," but there is no indication SSA, the parties, and their lawyers did not have a copy of the Los Angeles court's October 2012 minute order clearly specifying the visitation order. SSA's case plan required father to attend and participate in a county certified domestic violence prevention program, to maintain his relationship with M.P. by following conditions of the visitation plan, and to stay sober and comply with drug tests. The visitation schedule stated father was to have visits two times monthly when he visited in Orange County, and authorized SSA to liberalize the frequency and duration of his visits and whether monitored visitation was needed. As noted, father did not lodge an objection.

At the detention hearing on February 25, 2013, father's lawyer requested placement, and mentioned the October 2012 visitation order, but counsel did not assert SSA had failed to abide by its terms. Nor did he state that father had fulfilled the preconditions of that order by testing clean and by providing notice. Father, who attended the hearing, does not deny he had not visited M.P. since at least October 2012.

Father claims he made numerous requests to the social worker for unmonitored visitation. But there is no evidence he advised the social worker or the court he believed the Los Angeles order had been ignored. While we are unaware of any authority that would have allowed SSA to impose sua sponte additional conditions (e.g., a domestic violence program) to the Los Angeles court's October 2012 unmonitored visitation order, father failed to object to the December 19 case plan. He also took no action thereafter to alert SSA or the juvenile court he had tested clean since October 2012 and therefore was entitled to receive unmonitored visits per the Los Angeles order without participation in a domestic violence program. Father forfeited his complaint and acceded to SSA's monitored visitation arrangement by failing to alert the Orange County juvenile court it had not complied with the Los Angeles court's directives. (See *In re*

15

*Christina L.* (1992) 3 Cal.App.4th 404, 416 [if parent felt services offered were inadequate, she had the assistance of counsel to seek guidance from the juvenile court in formulating a better plan, "'"law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them"'"]; Civ. Code, § 3527 ["law helps the vigilant, before those who sleep on their rights"].)[2] Finally, even if SSA and the court – because of ignorance, confusion or otherwise – failed to implement the Los Angeles court's orders after transfer to Orange County, the question for the court in August 2013 remained: whether M.P. should be returned to father. We turn to that issue.

D. *Dispositional Issues*

In his closing argument in the juvenile court, father asked the court either to return M.P. to his physical custody with family maintenance services, or to place her with the paternal grandmother. The court found placement with father would be detrimental and placement with the paternal grandmother was not in M.P.'s best interests.

SSA argues that because the Los Angeles court made a section 361 detriment finding against father in October 2012 and removed M.P. from his custody, the court in August 2013 was not required again to find placement with father would be detrimental to M.P. According to SSA, father was required to seek modification of the prior order by showing a change of circumstances and that modification to return custody to him (to "get back in the game") was in M.P.'s best interests. SSA hedged on the issue during closing argument in the juvenile court, and the parties cite no authority resolving the issue. Father and M.P.'s counsel assert the court was required to find that returning M.P. to father posed a substantial risk of detriment to the child.

Section 361, subdivision (c)(1) provides, "A dependent child may not be taken from the physical custody of his or her parents . . . unless the juvenile court finds

---

[2]      Father has not claimed he did not receive notice of the November and December 2012 Orange County hearings

16

clear and convincing evidence . . . [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." Section 361.2 provides, "(a) When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child."

Because M.P. was not in father's physical custody as of August 2013 (the court took custody from him in October 2012), and M.P. *was* residing with father at the time of events that brought her within the provisions of section 300 in 2010 and in 2012, it is not clear the court was required to make a further detriment finding as to father in August 2013. (See Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2013) § 2.141[3] at p. 2-451 [at disposition hearing after adjudication of the supplemental petition the juvenile court considers whether there is a need to remove the child from his or her current level of placement; where supplemental petition for removal from a parent is granted, it does not return the case to "square one" for the provision of reunification services; if a dependent child was previously returned to parental custody and a supplemental petition is thereafter sustained and the child removed once again, the court must set a section 366.26 hearing unless there is a basis for additional reunification efforts].) But here the court did find in August 2013 by clear and convincing evidence that section 361 applied and to "vest custody with the *parents* would be detrimental to the child" (italics added) and M.P.'s welfare required removing her from the custody of her parents. Accordingly, we proceed from the assumption a detriment finding as to father

17

was required and turn to the issue whether substantial evidence supports the court's finding.

Father contends "[f]ollowing the events of April 2012, [he] participated fully in all court ordered services. He missed no tests and produced no positives or dilutes. His service providers praised his efforts. The social worker, however, operating under the assumption that Los Angeles County had already removed custody from Father, was not persuaded. [SSA social worker] Vanek believed Father needed to progress further in his domestic violence class and that the child could not be safe in his care until he agreed the sustained allegations contained in the previous petitions were true. [¶] . . . [¶] Moreover, to the extent it may be said that Father's late enrollment in the domestic violence program constitutes a failure to participate regularly in court ordered treatment, the remedy is to keep the case open, not to remove the child. (§ 364, subd. (c).)"

As father now agrees, in October 2012 the Los Angeles juvenile court found father's custody of M.P. posed a risk of detriment to the child. If nothing changed in the interim, placement with father in August 2013 also would be detrimental. In October 2012, the court gave father an opportunity to demonstrate he could safely parent M.P. by allowing him unmonitored visits. As noted above father did not avail himself of this opportunity. In fact, he did not visit M.P. at all until after SSA filed the supplemental petition in late February 2013. The court was entitled to consider the five-month gap in contact between father and M.P. in assessing detriment. The court also could consider that between February 2013 and August 2013, father did not progress beyond supervised visitation at SSA's offices. Although father now faults SSA for failing to allow him unmonitored visits, his failure to bring a complaint about visitation to the attention of the juvenile court before the August 2013 hearing made it almost a foregone conclusion the court would not return M.P. to his custody at that time. Again, the unmonitored visits were conditional, and the record does not establish that father fulfilled those conditions.

18

As for father's argument his test results were clean and he made all his scheduled appointments or had an authorized excuse beginning in March 2013, father produced no evidence he tested between October 2012 (and maybe even July 2012), and late March 2013. Father had a long history of alcohol addiction and relapse. The court's findings in October 2012 made it clear father's most recent relapse occurred in April 2012. Mother confirmed this at trial, and the Hawaii landlord's observations corroborated her claim. Father's relapse occurred despite a year of reunification services before the court returned M.P. to the parents and the family moved to Hawaii in October of 2011. Father denied relapsing in April 2012, but this conflicted with the court's findings and other evidence, including father's domestic violence counselor who testified father admitted using alcohol in Hawaii. The court was entitled to take father's credibility into account when weighing the risk of relapse and returning M.P. to his custody against evidence of his sobriety between late March 2013 and early August 2013 when he suddenly reappeared in M.P.'s life after five months without visiting her.

By August 2013, father had completed less than half the 52-week domestic violence program. His testimony concerning past domestic violence conflicted with the sustained findings of the juvenile court. In October 2012, the court found that on April 9, 2012, the "parents . . . engaged in a violent physical altercation in [M.P.'s] presence." The sustained allegations of the October 2010 petition included an allegation the parents "have a history of domestic violence in which the father *has physically struck the mother in 2010 and on prior occasions has engaged in violent acts against the mother*. Such domestic violence on the part of the father places the child at risk of harm." (Italics added.) Mother's testimony that father had committed physical violence against her and the Hawaii landlord's observations contradicted father's denials of alcohol use in April 2012 and his efforts to minimize past incidents of domestic violence. Mother testified father punched her in the face and gave her a black eye while she was pregnant with M.P. During the Hawaii incident, in addition to damaging property in the apartment, he

19

grabbed mother's wrists and hit her in the face leaving bruises. She contradicted father's claims of sobriety while they lived in Hawaii, and stated he drank during prior outpatient treatment. Father's adjudicated history of committing physical violence undermined his credibility at trial and weighed against returning M.P. to his custody. The court was entitled to give weight to the social worker's concerns about father's repetitive patterns of alcohol abuse and domestic violence that occurred after he completed treatment programs.

This is a close case, however.[3] There is no evidence father ever physically abused or neglected M.P., although his drinking and responsibility for violence in the home certainly created a risk of abuse and neglect. He tested clean for drugs and alcohol after the February 2013 hearing. He consistently attended AA meetings, had a sponsor, and appeared to grasp AA's 12 steps. Father enrolled in a domestic violence class promptly after SSA provided a referral. He received positive reviews from his service providers, and his domestic violence counselor, Kathryn Osgood, testified on his behalf at the hearing. According to Osgood, father did not fit the profile of a "batterer." She "totally believ[ed] in" father, who was "one of the absolute best clients" she had ever had, and he was "only the third person [in the 20 years] since [she had] been doing domestic violence groups that [she had] gone to court for." Her "confidence [was] based on his entire behavior . . . including his attendance, his level of participation . . . what he says in group." Father had perfect attendance and never missed a group session. Osgood

---

[3]     Although only indirectly related to the detriment issue, the jurisdiction transfer from Los Angeles to Orange County cannot be described as seamless. SSA's reports in November and December 2012 did not mention the October 2012 visitation order. There is no indication social workers contacted father and clarified with him in November 2012 or soon thereafter what he needed to do to have unmonitored visits with M.P., which hurt father's chances to obtain custody of M.P. when mother's placement failed in February 2013. SSA appeared to evaluate the April 2012 incident more severely than did the Los Angeles court adjudicating the subsequent petition, which decided unmonitored visits were appropriate if father's drug test results were negative and he gave sufficient notice.

stated "as long as he stays involved in 12-step" she did not have any fears or concerns about his ability to parent M.P. Osgood noted father had gone through alcohol counseling with Terry Roehm, and the "success rate" of the combined programs was very high.

SSA's visit reports were favorable and there were no concerns "[w]ith the monitor there and everyone there and his interaction with" M.P. Father was employed and appeared to have strong support from family and friends in San Luis Obispo.

In conclusion, father appears to have made substantial progress in maintaining sobriety and gaining insight into eliminating a reoccurrence of domestic violence. Visits have been favorable. Assuming this progress continues through the 20-month mark at the .26 hearing, the circumstances would warrant a section 388 petition for the court again to assess these difficult and close issues.

III

DISPOSITION

The petition from the order referring the case for a section 366.26 selection and implementation hearing is denied, as is the request for a stay of the section 366.26 hearing set for December 11, 2013.


ARONSON, J.

WE CONCUR:


O'LEARY, P. J.


RYLAARSDAM, J.


21